[No. 28930.   Department Two.   June 30, 1943.]

ARTHUR H. SCHALOW *et al., Appellants,* v. WARREN OAKLEY, *Respondent.*[1]

[1]Reported in 139 P. (2d) 296.

*Henderson & McBee,* for appellants.

*Whittemore & Truscott,* for respondent.

ROBINSON, J.—On July 4, 1941, at about ten p. m., Mrs. Elnora Schalow was driving a Chevrolet automobile northerly on the Pacific highway at a point about one and one-half miles north of Burlington. In the automobile, as passengers and guests, were Martin Thorson, Paul Thompson, and Mrs. Schalow's minor daughter. All of the occupants of the car lived in Bellingham and were returning there after visiting relatives in Burlington.

While they were driving north, the respondent, Oakley, a young man twenty-one years of age, was driving south on the same highway. He was en route from Birch Bay, a few miles northwest of Bellingham, to his home in Seattle. He had as a companion a young man named Kniseley, who was asleep at the time of the accident. Kniseley was stationed at Pearl Harbor at the time of the trial. Both counsel were satisfied that he knew little of value about the matter, and his deposition was not taken.

Although the highway was almost perfectly straight, the two cars collided. The consequences were serious in the extreme, especially to the occupants of the Schalow car. Paul Thompson was instantly killed. Mrs. Schalow was very gravely and permanently injured. Martin Thorson, past eighty years of age, suffered a dislocated hip and some minor injuries.

This suit was brought by Mr. and Mrs. Schalow for damages with respect to her personal injuries and surgical expenses, joined by Martin Thorson who sought damages for his personal injuries, and by Mr. Schalow, as administrator of the estate of Paul Thompson. The cause was tried by a jury which rendered a verdict for the defendant, Oakley, on all the causes of action. A motion for new trial was made and denied, judgment

was entered on the verdicts, and this appeal was duly perfected.

Appellants present two questions to the court, which they state as follows:

"1. Was there evidence, or reasonable inference from evidence, to justify the verdict?

"2. Was there evidence sufficient to warrant the submission to the jury of the question of whether or not the respondent at the time of the accident was under the influence of or affected by the use of intoxicating liquor?"

The evidence in the record makes it clear that the collision occurred because one of the drivers left his side of the road and entered the rightful path of the other. The jury could have found (1) that the defendant, Oakley, encroached on Mrs. Schalow's side of the road, which would, of course, have necessitated a verdict for the plaintiffs; or (2) that Mrs. Schalow encroached upon Oakley's side of the road, which would have necessitated a verdict for the defendant; or (3) that it could not be determined from the evidence which of the drivers encroached upon the path of the other, which would also have necessitated a verdict for the defendant.

In considering the first question, "Was there evidence, or reasonable inference from evidence, to justify the verdict?" the inquiry is not: Was there evidence or reasonable inference from evidence to justify a finding that Mrs. Schalow drove into the path of the defendant's car? It was not necessary for the jury to so find in order to return a verdict for the defendant. The real question presented is: Was the evidence that Oakley drove into the rightful path of Mrs. Schalow's car so conclusive that the trial court should have set the jury's verdict aside and granted a new trial?

The question, of course, necessitates a review of the evidence.

Martin Thorson, who sat in the rear seat of the

Schalow car and was talking with Mrs. Schalow's small daughter, testified as follows:

"Q. As she [Mrs. Schalow] was driving down the road before the collision, did you see where she was driving on the highway? A. Oh, yes. Q. Where was she driving? A. Driving on the right side of the road. Q. Did you see the car that was driven by this young man before the collision? A. No, I just saw the light a few seconds before it happened. It come so quick that nobody could do anything. Q. When you saw those lights where was Mrs. Schalow's car on the road? A. She was on the right side."

We find the narrative versions of the testimony given by the respective drivers are so fairly and adequately set out in appellants' brief that we adopt them for our present purpose:

"The driver of appellants' car, Elnora Schalow, testified, in substance, that she was proceeding along on her proper side of the road, and that the respondent, approaching from the opposite direction, when he was about two or three car lengths from the Schalow car suddenly and without warning turned his car to his left immediately in front of the oncoming car of the appellant, thus causing the accident."

The appellants state the substance of Oakley's testimony as follows:

"Just prior to the accident I was driving at my usual speed of about 50 miles per hour. The traffic was pretty heavy going north. My lights were in good shape and I was driving on low beam. Coming down to the accident I was driving on my right hand side of the road. I saw the Schalow car when it was about one-quarter mile away. At the first noticing I saw her two lights; then all of a sudden I got the idea that she was turning off the road; either that, or the lights were blended into one. The lights turned at such an angle that they looked like they were one, or one light had gone off, and I thought that is where they were going, I thought, turn off; and when they came two again I decided that wasn't it, and they didn't mean to turn there. This occurred when we were about a quarter of a mile apart. I was then driving on my right hand

side of the road. Both cars continued to approach each other and I was on the right hand side at all times. I took it for granted she was on her right hand side, and as we approached the lights were bright, and just to reassure myself I was right where I was supposed to be I looked to the side of the road and knew I was where I should be, and when we came closer I ceased to drive by her lights and turned to see if I was where I should be, again, along the edge of the road. There was no idea of a sharp turn, but that last hundred feet I was positive I was where I belonged, but all of a sudden they were in front of me. When we were about to pass I wasn't over two feet from the right hand side of the road. I had taken my foot off the accelerator. To my knowledge I was on the right hand, the west side, of the pavement, not over two feet from the edge. The lights in the other car were not out. There was no idea of a sudden turn of her automobile yet, the last time I assured myself as to where I was on the road, and I looked back, there was the idea that they were practically in front of me, not absolutely lined up, headlight to headlight, but there was no chance to avoid the collision, and it was a hundred feet, or maybe less. I couldn't say whether I applied my brakes or attempted to turn. I don't believe I had time to do that. I don't remember anything after the collision."

The appellants concede that, ordinarily, the jury would have the right to choose between these conflicting versions of the matter, but not so in this instance, because they contend (1) that Oakley's testimony is subject to doubt and suspicion; and (2) that Mrs. Schalow's version is supported by physical facts that conclusively show that the collision occurred on the easterly side of the road.

It is contended that Oakley's testimony as to the collision should be accorded but little weight, for the reason that, several days after the accident and while still in the hospital at Burlington, he stated to someone that he did not remember anything about the trip after leaving the city limits of Bellingham. Oakley admitted that he made such a statement, and said it was true at the time, but added that, as the days went by,

a recollection of the whole matter came back to him, bit by bit, as he slowly recovered from the accident. The jury could believe this explanation. In addition to a dislocated hip and various cuts and lacerations, Oakley received a very severe concussion. Describing his condition when brought to the hospital in Burlington immediately after the accident, his attending physician said:

". . . he was not unconscious, but he wasn't clear at all times in questions asked him. He knew that he had been in an automobile accident, but outside of that he wasn't just clear as to what was going on. Q. Did his mental condition persist for some time? A. Yes, a matter of two or three days before he was completely clear, such as usually follows a concussion."

It is also contended that Oakley's testimony as to the collision should be discounted because of certain testimony concerning his use of intoxicating liquor. This evidence will hereinafter be referred to in detail in discussing the second question propounded by the appellants.

■ It is impracticable to enter into a detailed discussion of the physical facts which are testified to and illustrated by various maps, diagrams, and photographs which we cannot here reproduce and which cannot be accurately described. Some of the physical facts are, in our opinion, favorable to the respondent, and others, favorable to the appellants. The appellants particularly rely on evidence that dirt from the under-carriage of the car or cars and broken glass were found very slightly to the eastward of the yellow center line of the road. We do not think that this is conclusive of anything, for it is apparent that that might happen even if the greater portion of Mrs. Schalow's car was on the westerly side of the yellow line at the time of the collision.

Appellants rely even more strongly upon evidence as to certain skid marks. These are testified to and shown by photographs. Serious doubts are raised as

to whether they were made by Oakley's car, or, indeed, by either of the cars. They are only a few feet in length and may have been there before the collision happened. It is not impossible, although there is emphatic evidence to the contrary, that they were made when the Schalow car was dragged from the road by a wrecker. The position of the debris and these skid marks have probative value, but their force as evidence was a matter for the jury to determine, and we cannot say that these or other physical manifestations should have controlled its verdict.

■ Finally, as to the first question, a careful examination of the oral evidence and the exhibits leaves us without a fixed opinion as to which car was on the wrong side of the road. The jury, in its deliberations, may well have arrived at the same frame of mind. If so, it was its duty to find for the defendant. We, therefore, believe that the trial court correctly refused to set aside the jury's verdict and grant a new trial on the ground suggested by the first question propounded by the appellants.

■ The second question raised by the appellants arises out of the following background: The complaint made six specific allegations of negligence. The sixth and last read as follows:

"That the defendant drove and operated his automobile while he was under the influence of or affected by the use of intoxicating liquor."

At the request of the respondent, the trial judge gave the following instruction:

"Plaintiffs have failed to establish any proof that the defendant operated his automobile while under the influence of or while affected by the influence of intoxicating liquor. Therefore this item of alleged negligence is withdrawn from your consideration."

To the giving of this instruction the appellants took due and timely exception, and now urge that the giving thereof was error, entitling them to a new trial.

The evidence, which is contended to be substantial as to the allegation that Oakley was under the influence of or affected by the use of intoxicating liquor, was, in large part, elicited from Oakley himself. Under examination by appellants' counsel, he testified that he arrived at a beach resort at Birch Bay about 9:30 p. m. on July 3rd, to spend the holiday with some other young men in a cabin which they had reserved for that purpose. They had a bonfire on the beach that night at which beer was served. He estimated that he drank "a quart, a quart and a half, or two quarts." On the morning of the 4th, he drank a pint of beer at ten o'clock, a pint, or perhaps a pint and a half, with his lunch at 12:30 or one o'clock, and a "stubby" of beer, which is a short pint, at about 2:30 or three p. m., and had no more beer or any other alcoholic liquor that day. It will be noted that this last short pint of beer was consumed a full seven hours before the collision.

A witness named Comeaux, who does not appear to have been acquainted with any of the parties, testified that he was the first person to arrive at the scene of the accident. The seat cushion of Oakley's car was removed to serve as a headrest for Oakley's companion. Comeaux testified that he found a bottle in the hollow revealed by taking out the cushion, which bottle he threw out of the car; and, also, that there were a couple of empty beer bottles in the car.

"Q. This bottle you threw out, do you know what kind of bottle that was? A. The type of liquor? Q. Yes. A. Yes, I imagine it was whiskey. MR. TRUS-COTT: I move that be stricken. THE COURT: It will be stricken. Q. Was it a beer bottle or a whiskey bottle? A. It was a whiskey bottle."

Oakley testified later during the trial that he had no knowledge of any such bottle; that he had drunk no whiskey at any time, and it was brought out that several of his companions had used his car for side trips during his stay at Birch Bay.

An officer of the state highway patrol, who searched

Oakley's car, found a couple of empty stubby beer bottles in the rumble seat under the turtle back which, he testified, did not appear to have been "freshly used." The appellants concede that the evidence, above stated, might not convince a court of the truth of the allegation which the court withdrew from consideration, but stoutly contend that, when taken in connection with the fact that Oakley admitted that he told some one that, for four or five days after the collision, he remembered nothing after leaving Bellingham, and with Mrs. Schalow's testimony that he suddenly turned directly into her lane, it was sufficient to carry the issue to the jury, raised by the allegation that Oakley was operating his car while under the influence of or affected by the use of intoxicating liquor.

Appellants cite and rely upon four comparatively recent decisions of this court: *Garcia v. Moran,* 194 Wash. 328, 77 P. (2d) 988; *Burget v. Saginaw Logging Co.,* 197 Wash. 318, 85 P. (2d) 271; *Crown v. Miller,* 199 Wash. 354, 91 P. (2d) 713; and *State v. Hurd,* 5 Wn. (2d) 308, 105 P. (2d) 59. We will discuss these cases briefly in that order.

In the *Garcia* case, a policeman testified that he detected a strong odor of whiskey on appellant's breath, and the plaintiff testified:

"Well, Mr. Moran [the defendant] looked like he didn't see until he happened to look up and he saw me. It seemed to me like he got startled, like he got awake from thought, or something like that, see?"

It was held that the court did not err in refusing to withdraw from the jury the issue as to whether or not the defendant was under the influence of intoxicating liquor.

In the *Saginaw Logging Co.* case, there was evidence that the defendant was noticeably drunk four and one-half hours prior to the accident. "His tongue was heavy and it was hard for him to talk; and his eyes, he

had a sort of drunkman's stare." It was held that this evidence was sufficient to take the issue to the jury.

In *Crown v. Miller,* we find from the opinion, as supplemented by a reexamination of the statement of facts, that the plaintiff was injured by a collision between the car in which she was a passenger and a truck and trailer, the collision occurring at night on the Snoqualmie Pass highway. The truck driver testified that, as he came down the western slope in his right-hand lane, he saw a car approaching from the west, about six hundred feet distant, and was troubled by its bright lights. He snapped on his own bright lights and instantly dimmed them to attract the driver's attention. The car came on, driving in about the middle of the paved portion of the roadway, and without dimming its lights. When it got about 175 or 200 feet from him, the truck driver pulled to the right and got his right front wheel on the gravel shoulder, but the oncoming car collided with the side of his trailer. When he stopped and ran back, he found two women, the plaintiff and the wife of the driver, unconscious or semiconscious in the rear seat, and there was an odor of alcoholic liquor about the car. He flagged down an automobile going west. Its occupants were two young women who had spent the day in the mountains skiing. They were both called as witnesses. Each testified that, as they stood at the open door of the colliding car, they detected a strong odor of alcoholic liquor; that they took the two women and the driver of the car into the rear seat of their car and drove them to a hospital near North Bend, and that the odor of alcoholic liquor kept coming from the rear seat the entire distance.

The driver, his wife, and the appellant acknowledged no consumption of liquor other than a round of sloe gin before breakfast some seven or eight hours before, and that the two women, but not the driver, each had a bottle of beer at North Bend about a half hour before

the collision. This court held that the trial court did not err in refusing to give the following instruction:

"You are instructed that the evidence in this case fails to show that the plaintiff or the driver of plaintiff's car were intoxicated at the time of the collision in question, and you are further instructed that you are to disregard any evidence or inferences made by defendants' counsel concerning the same."

*State v. Hurd* is cited to show that, in construing a criminal statute, this court held that the phrases "affected by the use of intoxicating liquor" and "under the influence of intoxicating liquor" mean the same thing, and that the offense is made out, if it be proven that, on account of the use of intoxicating liquor, the accused's ability to operate a motor vehicle was lessened in the slightest degree.

We think the *Hurd* case has but little relevancy to the present inquiry, and that the other three cases are quite obviously distinguishable. There was no evidence in this case that the defendant had an odor of whiskey on his breath, or that of any other alcoholic liquor, and none of conduct or appearance from which a fair inference could be drawn that he was under the influence of intoxicating liquor, both of which elements were present in the *Garcia* case. Nor is there any evidence that he was noticeably drunk four and one-half hours before the collision, as in the *Saginaw Logging Co.* case, or at any other time. Nor was there any evidence of the odor of liquor about his car or person, as was shown in *Crown v. Miller.*

If there had been testimony that the defendant had the odor of liquor on his breath, evidence that he had a partially filled bottle of whiskey (if it was whiskey) in his car would have been very damaging to his defense, but, standing alone, it is not substantial evidence in support of the allegation that he was under the influence of liquor. There can be no presumption that one who has intoxicating liquor in his car has intoxicating liquor in his blood stream. Again, if there had

been evidence that there was an odor of liquor on Oakley's breath or about his car, the evidence that he drank a pint of beer seven hours before, or greater quantities the night before, would be materially corrobative, since it would show at least that he was not a total abstainer. But we cannot hold that evidence that a pint of beer was consumed by a young man at ten o'clock in the morning, followed by a pint or a pint and a half with his lunch at 12:30 or one o'clock, followed by a short pint at 2:30 or three p. m., is substantial evidence that he was, therefore, "under the influence of or affected by the use of intoxicating liquor" at ten p. m. that night. It is our opinion that the trial court did not err in withdrawing the issue from the jury.

The judgment appealed from is affirmed.

SIMPSON, C. J., BEALS, BLAKE, and GRADY, JJ., concur.

